# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JUSTIN E. ADAMS,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:18cv00001 |
| | ) | **REPORT AND RECOMMENDATION** |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of** | ) | By:  PAMELA MEADE SARGENT |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Justin E. Adams, ("Adams"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011, West 2012 & 2018 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Adams protectively filed his applications for DIB and SSI on February 27, 2013, alleging disability as of November 15, 2012, due to seizures and "nerve problems." (R. at 25, 237-38, 241-44, 260, 264.) The claims were denied initially and upon reconsideration. (R. at 143-45, 151-54, 156-61, 163-65.) Adams then requested a hearing before an ALJ. (R. at 166-67.) The ALJ held a video hearing on May 12, 2016, at which Adams was represented by counsel. (R. at 54-88.)

By decision dated October 5, 2016, the ALJ denied Adams's claims. (R. at 25-47.) The ALJ denied a motion Adams's counsel had made at the hearing for a consultative psychological examination, including administration of Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), testing. (R. at 25.) In particular, the ALJ found that because Adams underwent psychological testing in school, and there were adequate psychological treatment notes contained in the record, further testing of his intellectual ability was not required to decide the case. (R. at 25.) The ALJ found that Adams met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2017.[1] (R. at 28.) The ALJ found that Adams had not engaged in substantial gainful activity since November 15, 2012, the alleged onset date. (R. at 28.) The ALJ found that the medical evidence established that Adams had severe impairments, namely a seizure disorder; thoracolumbar spondylosis; hepatitis C; a mood disorder;

---

[1] Therefore, Adams had to show that he was disabled between November 15, 2012, the alleged onset date, and October 5, 2016, the date of the ALJ's decision, in order to be eligible for DIB benefits.

generalized anxiety disorder; and opioid dependence, but he found that Adams did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28-31.) The ALJ found that Adams had the residual functional capacity to perform medium work[2] that did not require climbing ladders, ropes or scaffolds; that did not require more than occasional crawling, interacting with the public or co-workers and use of judgment on the job; that did not require more than frequent climbing of ramps or stairs, stooping, kneeling or crouching; that did not require even moderate exposure to hazards like moving machinery and heights; that allowed for an individual to be off task for about 10 percent of each workday; and that allowed for an individual to be absent about once monthly. (R. at 31.) The ALJ also found that Adams was not able to perform his past relevant work. (R. at 45.) However, based on Adams's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Adams could perform, including jobs as a furniture assembler, a hand packager, an assembler and a bottling line attendant. (R. at 45-46.) Thus, the ALJ concluded that Adams was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 47.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2018).

After the ALJ issued his decision, Adams pursued his administrative appeals, (R. at 321-23), but the Appeals Council denied his request for review. (R. at 1-6.) Adams then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2018). This case is before this court on Adams's motion for

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2018).

summary judgment filed August 2, 2018, and the Commissioner's motion for summary judgment filed September 4, 2018.

## II. Facts

Adams was born in 1981, (R. at 61, 37, 241), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Adams has a tenth-grade education[3] with special education instruction and past relevant work as a flagger for a tree business and a mechanic's helper for a trucking company. (R. at 31, 61-63, 265.) He stated that he stopped working as a mechanic's helper in 2012 due to depression and back pain. (R. at 63-64.) Adams stated that he had difficulty reading and with reading comprehension, noting that he could not read a grocery list. (R. at 62, 74.) He stated that he did not complete any of the forms related to his disability claim. (R. at 75.) He testified that he had back pain that radiated into his legs, as well as numbness, sometimes causing him to fall. (R. at 65.) Adams stated that the pain and numbness were worse on the right side. (R. at 71.) He estimated that he could stand or walk for up to 15 minutes without having to sit down or recline. (R. at 71.) Adams testified he could not stoop, bend, squat or kneel due to back pain, and he could not carry items while walking due to balance issues. (R. at 73-74.) He testified that he could carry items weighing up to five pounds. (R. at 74.) Adams stated that he was not taking any pain medication, but he would lie on his back and elevate his legs to relieve his back and leg pain and numbness. (R. at 72.)

Adams testified that he suffered from "deep depression" and bipolar disorder and that he mostly stayed alone and was withdrawn from his family. (R. at 65.) He

---

[3] Adams testified that he did not receive his general equivalency development, ("GED"), diploma. (R. at 61.)

stated that he isolated himself from others, including his family, and he did not go out in public places, including the grocery store. (R. at 67-68.) Adams testified that he had overdosed on Neurontin and other medications in attempts to harm himself. (R. at 68.) He testified that he was in counseling, and he was taking medication, which was helping, but some days were worse than others. (R. at 68-69.) Adams testified that his memory was not good, and he needed reminders to take his medication and to perform everyday activities. (R. at 69.) He stated that he suffered panic attacks two or three times weekly, which lasted up to three minutes or longer, and he felt drained and confused afterwards. (R. at 70.)

Adams testified that he had been addicted to opiates in the past, for which he had treated with Suboxone, both legitimately and illicitly. (R. at 72-73.) He was not taking Suboxone at the time of the hearing, and he stated that it had been more than a year since he had taken Suboxone or opiate medication that had not been prescribed for him. (R. at 76-77.) Adams testified he had not used other illicit street drugs in two or three years. (R. at 77.) He stated that he had treated at The Laurels, a recovery center, in March 2014, and at Watauga Recovery Services, a Suboxone clinic, in March 2015. (R. at 77.) In April 2016, Adams treated at Sunrise Medical, another Suboxone clinic. (R. at 77-78.) Adams testified that he had never had a driver's license. (R. at 75.)

John Newman, a vocational expert, also testified at Adams's hearing. (R. at 79-85.) Newman was asked to consider a hypothetical individual of Adams's age, education and work history, who had the residual functional capacity to perform medium work; who could never climb ladders, ropes or scaffolds; who could occasionally crawl; who could frequently climb ramps or stairs, stoop, kneel and crouch; who must avoid even moderate exposure to hazards like moving machinery and parts; who may have occasional interaction with the public and

with co-workers; who can use no more than occasional judgment on the job; who would be off task around 10 percent of the workday; and who would be absent from work about once monthly. (R. at 80.) Newman testified that such an individual could not perform any of Adams's past work, but could perform other jobs existing in significant numbers in the national economy, including those of a furniture assembler and a hand packager, both at the medium level of exertion, as well as an assembler and a packer, both at the light[4] level of exertion. (R. at 80-82.)

In rendering his decision, the ALJ reviewed records from Linda Dougherty, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Jo McClain, Psy.D., a state agency psychologist; Lonesome Pine Hospital, ("Lonesome Pine"); University of Virginia Health System, ("UVA"); Wise County Behavioral Health Services, ("WCBHS"); Norton Community Hospital; Norton Community Schools; The Health Wagon; Appalachia Family Health; Sunrise Medical Associates; Watauga Recovery Center; Tauna Gulley, F.N.P., a family nurse practitioner; The Laurels; Community Clinic at Norton Community Hospital, ("Community Clinic"); and Mountain View Regional Medical Center. Adams's counsel submitted additional medical records from B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, to the Appeals Council.[5]

Adams's school records show that he underwent a psychological evaluation by Gene Collins, a school psychologist, on December 18, 1996, at the age of 15. (R. at 480-84.) Adams was referred by a guidance counselor to determine if

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1563(b), 416.963(b) (2018).

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

suspected emotional problems were severe enough to warrant special education services and intervention. (R. at 480.) Collins noted that Adams's attendance had worsened dramatically that year and coincided with a psychiatric referral and treatment for suicidal ideation, various emotional complaints and alopecia. (R. at 480.) Adams was currently receiving homebound educational instruction. (R. at 480.) On testing, Adams worked fast and carelessly on all items, but he seemed satisfied with his testing performance regardless of whether it was good or poor. (R. at 481.) Collins noted that these were not his best efforts, but were felt to represent valid, reliable samples of his current abilities and state of adjustment. (R. at 481.) IQ testing yielded a composite score of 81 +/- 2, which placed Adams in the "slow learner" educational classification. (R. at 481.) Wide Range Achievement Test – Third Edition, ("WRAT-3"), testing indicated that Adams's reading and spelling abilities were at the fifth-grade level, while his math abilities were at the sixth-grade level, which corresponded to his IQ score. (R. at 481.) Collins found that Adams was socially and emotionally immature for his age. (R. at 482.) Strong depressive and anxiety symptoms were suggested by testing, and Adams's emotional state served to disrupt his attention and concentration and task completion skills within the educational environment. (R. at 482.) Collins recommended that Adams be considered eligible for special education services as soon as possible. (R. at 483.) He noted that Adams's socioemotional adjustment was very poor and appeared to significantly impact upon his learning and functioning. (R. at 483.)

During the relevant time period, Adams treated at WCBHS from December 11, 2012, to December 31, 2013. (R. at 348-404.) On December 11, 2012, Adams requested admission to The Laurels for detoxification, reporting years of drug use, including Percocet, Lortab, Klonopin, Xanax and marijuana. (R. at 358.) Adams stated that he had "bad nerves" and no health insurance. (R. at 358.) He reported a

prior admission to The Laurels in September 2011, but he signed out against medical advice and received no aftercare because he could not afford it. (R. at 358.) Adams stated he experienced panic attacks and could not be around people. (R. at 358.) He stated that he had not taken his prescribed seizure medication in "a while" and that his last seizure was two or three months previously. (R. at 358.) He denied auditory or visual hallucinations or paranoia, as well as suicidal or homicidal ideation, but he endorsed trouble with his temper. (R. at 358.) Pamela Varner, R.N., advised Adams to call The Laurels with his pre-admit information so he would be "in line" for inpatient treatment. (R. at 358.) Over this time, Adams saw Brenda Palmer, a certified substance abuse counselor, for case management, and Joyce Thompson, F.N.P., a family nurse practitioner, for psychiatric medication management. On September 30, 2013, Adams advised Palmer he had a long history of depression and anxiety and stated he would like to be prescribed medication. (R. at 398.) However, he reported no previous psychiatric services. (R. at 399.) On October 9, 2013, Adams advised Palmer he had smoked marijuana a couple of times since his previous appointment, and he hoped the nurse practitioner would prescribe him medication so he no longer had to self-medicate. (R. at 393.) Adams was fully oriented, mildly depressed with a congruent affect, he denied suicidal or homicidal ideations, and he had adequate grooming skills. (R. at 393.) Palmer diagnosed Adams with opioid dependence; sedative, hypnotic or anxiety medication abuse; cannabis dependence; and nicotine dependence; and she assessed his then-current Global Assessment of Functioning, ("GAF"),[6] score at 55.[7] (R. at 400.)

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health – illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), at 32 (1994 American Psychiatric Association).

[7] A GAF score of 51 to 60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

On October 15, 2013, Adams saw both Palmer and Thompson. (R. at 389-92.) He continued to use marijuana weekly, but expressed a desire to "stop all drug use." (R. at 389.) Adams stated that he suffered from panic attacks that prevented him from being around others, he had racing thoughts, he angered easily, previously had thoughts of hurting himself or others, felt very depressed, had no goals, and he had difficulty sleeping, a decreased appetite and difficulty concentrating. (R. at 390.) He admitted to a significant substance abuse history. (R. at 390.) On mental status examination, Adams was fully oriented, with appropriate grooming and hygiene, rapport was easily established, he had clear, coherent and relevant speech, he maintained good eye contact, no abnormal psychomotor activity was observed, he had a mildly depressed mood and a mildly anxious affect, cognitive functioning was grossly intact, general fund of information was average, and he answered questions and participated in treatment discussions and planning. (R. at 391.) Adams denied suicidal or homicidal ideations, as well as auditory or visual hallucinations. (R. at 391.) Thompson diagnosed Adams with a mood disorder; opioid dependence; and chronic neck and back pain; and she assessed his GAF score at 55. (R. at 391.) She prescribed Celexa. (R. at 391.) Dr. Rhonda K. Bass, M.D., a psychiatrist, reviewed Thompson's report. (R. at 392.)

On November 7, 2013, a urine drug screen was positive for tetrahydrocannabinol, ("THC"), benzodiazepines and buprenorphine.[8] (R. at 382.) Adams admitted to Palmer that he smoked marijuana and took pain medications and Klonopin. (R. at 383.) He was fully oriented, had a mildly depressed mood with congruent affect, adequate grooming skills, and he denied suicidal and homicidal ideations. (R. at 383.) He was encouraged to consider attending peer recovery groups. (R. at 383.) When he returned to Palmer on December 11, 2013, he reported doing better, stating he had decreased his drug use. (R. at 377.) He

---

[8] Buprenorphine is the generic name for Suboxone.

continued to have some symptoms of depression and anxiety and was encouraged to cease illicit drug use to allow his medications to work properly. (R. at 377.) Adams's mental status examination remained unchanged, and Palmer noted that he had made some progress. (R. at 377.) She encouraged him to consider detoxification. (R. at 377.) On December 31, 2013, Adams saw both Palmer and Thompson. (R. at 373-76.) He reported having a nice Christmas and enjoying time with his family. (R. at 373.) He stated that he had not used drugs for two weeks and was feeling much better. (R. at 373.) Adams stated that Celexa and drug cessation was helping with his anxiety and panic attacks. (R. at 373, 375.) He reported some continued mood swings that he wished to level out, as well as impulsivity and irritability. (R. at 373, 375.) Adams stated a desire to begin peer recovery groups at his next appointment. (R. at 373.) On mental status examination, he was fully oriented, he denied suicidal and homicidal ideations, he had intact thought associations, organized and goal-directed thinking, a mildly anxious mood and affect with fairly good range and appropriate to his mood, the conversation and situation, and he had adequate grooming skills. (R. at 373.) Adams denied auditory and visual hallucinations, as well as use of alcohol or illicit substances. (R. at 375.) Dr. Bass reviewed this report. (R. at 376.) Palmer diagnosed Adams with opioid dependence; sedative, hypnotic or anxiety medication abuse; cannabis dependence; and a mood disorder, not otherwise specified; and she placed his then-current GAF score at 55. (R. at 365.) Adams did not show for appointments on October 23, October 30 and November 21, 2013. (R. at 379, 384-85, 387-88.) He canceled appointments on January 15 and January 30, 2014. (R. at 368-69, 371-72.)

Adams presented to the emergency department at Lonesome Pine on November 8, 2012, with complaints of vomiting, sore throat and diarrhea for two days. (R. at 328-31.) He was alert and in no acute distress, and he denied illicit

drug use. (R. at 328-29.) Adams's mental status was within normal limits, including a normal mood and affect, and he had a normal neurologic status. (R. at 328, 330.) The remainder of his physical examination also was normal, including no extremity tenderness or edema and full range of motion in all extremities. (R. at 330.) He was diagnosed with a gastrointestinal virus. (R. at 330.) On January 30, 2013, Adams returned to Lonesome Pine with complaints of a rash to his face/chin and right arm. (R. at 332-36.) He, again, denied illicit drug use. (R. at 332.) Adams was alert, oriented and in no acute distress, cranial nerves were intact, there was no motor or sensory deficit, no extremity tenderness or edema, and Adams had a full range of motion in all extremities. (R. at 333-34.) His mood and affect were normal. (R. at 334.) Adams was diagnosed with contact dermatitis. (R. at 334.)  On February 25, 2013, Adams presented to the emergency department at Lonesome Pine with complaints of facial pain. (R. at 337-43.) He again denied the use of illicit drugs. (R. at 337.) Both mental status and neurological examination were within normal limits. (R. at 337-38.) Adams was diagnosed with allergic contact dermatitis due to drugs in contact with the skin. (R. at 338.)

Adams saw Dr. Mark Quigg, M.D., at UVA Department of Neurology on January 9, 2013, for evaluation of seizures. (R. at 345-47.) Dr. Quigg noted that Adams had experienced a generalized tonic clonic seizure in May 2012, witnessed by his brother, and for which he had no warning symptoms. (R. at 346.) Although he underwent some type of evaluation, no medication was prescribed. (R. at 346.) Later that fall, Adams had a second unprovoked daytime generalized convulsion, during which he hit his head and bit his lip. (R. at 346.) After this, Adams was prescribed Dilantin. (R. at 346.) However, he had not taken it for a month because he ran out of pills. (R. at 346.) Adams had not undergone any electroencephalogram, ("EEG"), or neuroimaging. (R. at 346.) Adams's medical history was significant for "bad nerves" during high school, which was treated with

Xanax. (R. at 346.) He reported marked agoraphobia with panic attacks, as well as depression with depressed mood, anhedonia and lethargy, but without weight problems or suicidality. (R. at 346.) He made poor eye contact, but was alert, oriented and fluent with normal and full visual fields, normal fundi and symmetric eye movements. (R. at 346.) His face was symmetric to sensation and movement, his tongue was midline, muscle strength, tone and bulk were normal without abnormal movements, gross sensation was intact, gait and coordination were normal, deep tendon reflexes were symmetric, and Adams had no pathologic reflexes. (R. at 346.) Dr. Quigg diagnosed probable idiopathic generalized epilepsy. (R. at 347.) He switched Adams to Zonegran, he ordered a local MRI and EEG and scheduled a follow-up appointment for April. (R. at 347.) Dr. Quigg noted that if Adams was seizure-free at that time, he could begin to address the agoraphobia and panic attacks. (R. at 347.) When Adams returned to Dr. Quigg on April 10, 2013, he was alert, oriented and fluent with a symmetric face, symmetric eye movements and no visual field defects. (R. at 344-45.) Muscle strength, tone and bulk were normal without abnormal movements. (R. at 344.) Gross sensation was intact, and gait, station and reflexes were normal. (R. at 344.) Dr. Quigg opined that Adams's probable idiopathic epilepsy was under good control. (R. at 344.) He again ordered a local MRI and EEG, as well as a local psychiatric referral. (R. at 344.)

On May 31, 2013, Adams presented to the emergency department at Norton Community with complaints of right leg pain after being hit by a car two days previously. (R. at 445-53.) He was diagnosed with multiple contusions and an abrasion to the right leg with early cellulitis. (R. at 446.) X-rays of Adams's lumbar spine, taken on May 29, 2013, showed no acute abnormality, but mild spondylosis at the L4-L5 disc space. (R. at 412.) Pelvic x-rays from the same date showed no acute abnormality, and a CT scan of the thorax showed no evidence of

acute trauma, but did show emphysematous chronic obstructive pulmonary disease, ("COPD"). (R. at 413-14.) Adams also underwent x-rays on May 31, 2013, which revealed no abnormalities of the right ankle, right leg, right knee or right hip. (R. at 449-52.) X-rays of the pelvis showed a calcific appearing density overlying the lateral right ilium. (R. at 453.) Adams received Percocet and Bactrim. (R. at 448.) He returned to the emergency department on November 12, 2013, with complaints of pain and swelling in the left chest that was painful to the touch. (R. at 440-44.) An ultrasound revealed probably gynecomastia. (R. at 444.)

On November 13, 2013, Linda Dougherty, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Adams was mildly restricted in his activities of daily living, had moderate difficulties in maintaining social functioning, had mild difficulties maintaining concentration, persistence or pace and had not suffered any repeated episodes of decompensation of extended duration. (R. at 95-96.) Dougherty also completed a mental residual functional capacity assessment on the same day, finding that Adams was moderately limited in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 98-100.) Dougherty found that Adams had no understanding and memory limitations. (R. at 98.) In all other areas of sustained concentration and persistence, social interaction and adaptation, Dougherty found that Adams was not significantly limited. (R. at 98-100.) She concluded that Adams would be able to perform simple and repetitive tasks without difficulty, but may have some difficulty with the public. (R. at 100.)

Also on November 13, 2013, Dr. Robert McGuffin, M.D., a state agency physician, completed a physical residual functional capacity assessment of Adams, finding that he had no exertional limitations. (R. at 97-98.) Dr. McGuffin found that Adams could balance, stoop, kneel, crouch and crawl on an unlimited basis; frequently climb ramps and stairs; and never climb ladders, ropes or scaffolds. (R. at 97.) He imposed no manipulative, visual or communicative limitations, but he opined that Adams should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 97-98.) Dr. McGuffin based these limitations on seizure precautions. (R. at 97-98.)

Adams was seen in the emergency department at Norton Community on March 22, 2014 for a Klonopin overdose. (R. at 427-39.) Adams was admitted to The Laurels for detoxification from March 25 to March 27, 2014, and was diagnosed with opioid withdrawal. (R. at 547-50.) At discharge, an appointment with WCBHS was scheduled for April 1, 2014. (R. at 548.) There is no treatment note from April 1, 2014, contained in the record.

On May 12, 2014, Adams saw Dr. Saleem Sheikh, D.O., and Dr. Jody Bentley, D.O. at the Community Clinic to establish new patient status. (R. at 405-10.) He complained of back pain and depression, but reported that he had no major, chronic medical problems and took no medications regularly. (R. at 405.) Adams stated that Lortab worked better than Tylenol for his back pain, which was worsened by walking and alleviated with rest and medication. (R. at 405.) He also reported occasional numbness and tingling in his legs when walking too long. (R. at 405.) On physical examination, Adams was alert, oriented and in no acute distress, the low back was tender to palpation, and there was increased lumbar lordosis, but the cervical spine lordosis was within normal limits, and Adams had normal thoracic kyphosis. (R. at 406.) The lumbar region was stiff, tender and

-14-

restricted. (R. at 407.) Sensory exam was normal to light touch and pinprick, motor exam was normal, and cranial nerves were intact. (R. at 406.) Adams was diagnosed with chronic radicular low back pain and depression, he was referred for pain management and psychiatry, and x-rays and an MRI of the lumbar spine were ordered. (R. at 407-08.)

On July 14, 2014, Jo McClain, Psy.D., a state agency psychologist, completed a PRTF of Adams, finding that he was not restricted in his activities of daily living, had mild difficulties in maintaining social functioning, moderate difficulties maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 122.) McClain also completed a mental residual functional capacity assessment of Adams, finding that he did not have any understanding and memory limitations. (R. at 125-27.) McClain further found that Adams was moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 125-27.) In all other areas of concentration and persistence, social interaction and adaptation, McClain opined that Adams was not significantly limited. (R. at 125-27.) McClain concluded that Adams would be able to perform simple and repetitive tasks without difficulty, but he may have some difficulty with the public, and limited social interactions were recommended. (R. at 127.) She confirmed Dougherty's findings. (R. at 127.)

Also on July 14, 2014, Dr. Carolina Bacani-Longa, M.D., a state agency physician, completed a physical residual functional capacity assessment of Adams, finding that he could perform medium work; stand and/or walk about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; that he had an unlimited ability to balance; that he could frequently climb ramps and stairs, stoop, kneel and crouch; occasionally crawl; never climb ladders, ropes or scaffolds; and that he should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 123-25.) Dr. Bacani-Longa noted that these restrictions were due to lower back pain status-post motor vehicle accident and seizure precautions. (R. at 124-25.) She imposed no manipulative, visual or communicative limitations. (R. at 124-25.)

Adams was transported to the emergency department at Norton Community on July 30, 2014, after being found unresponsive. (R. at 416-26.) X-rays of the lumbar spine showed degenerative changes at the L5-S1 level and mild posterior disc space narrowing at the L4-L5 disc space. (R. at 421.) A chest x-ray showed no acute process, and a CT scan of the cervical spine showed no abnormality. (R. at 422-23.) A CT scan of Adams's head showed no acute intracranial abnormality, but moderate chronic sinusitis. (R. at 425.) Adams was diagnosed with multiple substance abuse with transient altered mental status and a mild to moderate urinary tract infection. (R. at 419-20.) He was prescribed Keflex and Bactrim. (R. at 420.)

Adams presented to the Community Clinic on August 11, 2014, for a re-evaluation for suicide attempt[9] by overdosing on Suboxone, Xanax and synthetic marijuana. (R. at 552-56.) He complained that his "nerves" were "really bad," but denied being actively suicidal or thinking of hurting himself. (R. at 552.) He

---

[9] This treatment note characterizes Adams's July 30, 2014, visit to the emergency department as a suicide attempt. (R. at 552.)

reported feeling "a bit nervous." (R. at 552.) He stated he had not been able to get an MRI done. (R. at 552.) It was noted that Adams would be referred for physical therapy after imaging studies were complete. (R. at 552.) Adams complained of back pain, rib soreness, anxiety and depression. (R. at 552.) He was alert, oriented and in no acute distress, muscle strength and tone were normal, cranial nerves were intact, sensation was normal, and motor exam was normal, but the low back was tender to palpation without severe tenderness on palpation of the vertebrae in the cervical/thoracic region. (R. at 553.) Adams had increased lumbar lordosis, and the lumbar region was stiff, tender and restricted. (R. at 553-54.) He denied being suicidal or having thoughts of harming others. (R. at 553.)  Adams was diagnosed with chronic radicular low back pain and depression. (R. at 554.) He was deemed stable and was encouraged to see a psychiatrist for assistance in managing his suicidal behavior and psychiatric problems. (R. at 554.) It was noted that pain management would be scheduled after Adams saw psychiatry and was deemed not at risk for overdosing on pain medication. (R. at 554.)

Adams was seen at Watauga Recovery Center for outpatient Suboxone treatment on a weekly basis for approximately five and a half months, from February 2, 2015, through July 17, 2015. (R. at 505-27, 655-65.) On February 2, 2015, Adams reported that his drug of choice was OxyContin/oxycodone and that he had used Suboxone, THC and hydrocodone in the prior 24 hours. (R. at 505, 507.) Dr. Rodolfo Cartagena, M.D., diagnosed Adams with opioid dependence, depression and anxiety, and he prescribed Suboxone and Paxil. (R. at 505.) When Adams returned on February 9, 2015, he stated that he did well with Suboxone, but could not tolerate Paxil. (R. at 508.) He stated that he was struggling with his "nerves." (R. at 509.) Adams also stated that he was craving benzodiazepines and had a plan to use Xanax that week. (R. at 508.) On examination, Adams was alert, oriented and cooperative, with a normal gait, full strength in all extremities and no

focal deficits. (R. at 508.) He was diagnosed with opioid/benzodiazepine dependence. (R. at 508.) It was noted that Adams needed to attend "meetings," and he needed a sponsor. (R. at 508.) He received Suboxone and Klonopin. (R. at 509.) From February 23 to March 30, 2015, Adams continued to report no relapses or new issues. (R. at 514, 517, 519, 522, 525, 527.) On February 23, 2015, he stated that he felt stable on medications. (R. at 514.) Adams was prescribed a low dose of Neurontin after he reported taking a family member's Neurontin for nighttime leg pain he had experienced since being hit by a car. (R. at 515-16.) Adams was continued on Klonopin over this time. (R. at 515, 522, 525, 527.) In March 2015, he stated that he was doing "alright" and doing "well" and that Neurontin had "really helped" him. (R. at 522, 524, 527.) He did not attend any meetings over this time. (R. at 518, 524, 527.) Physical examinations were normal, including showing that Adams was alert, oriented and cooperative with normal speech, no psychosis and a normal affect. (R. at 515, 521, 524, 527.) He also had a normal gait, full strength in all extremities and no focal deficits. (R. at 518, 521, 524, 527.) Adams's urine drug screens were not showing Klonopin as they should. (R. at 519.) His diagnosis over this time was opioid/benzodiazepine dependence. (R. at 515, 518, 521, 524, 527.)

Beginning on April 6, 2015, Adams was described as generally noncompliant, he had missed a psychiatric appointment after a six-week wait, and he had chronically absent Klonopin levels. (R. at 655.) However, Adams stated that he had had a good week and had attended meetings, which he was enjoying. (R. at 656.) Klonopin and Neurontin were discontinued, and Adams was advised he must see a psychiatrist. (R. at 655.) It was noted "zero tolerance last chance." (R. at 655.) On April 13, 2015, Adams's levels of buprenorphine were "almost nonexistent," and he was discharged from the program for 60 days. (R. at 657.) When Adams returned to treatment on July 3, 2015, he admitted he had not been

taking his medications properly, he had relapsed, and he stated he was not getting his nerve medication. (R. at 659.) Specifically, Adams reported using street Suboxone, THC and Lortab. (R. at 660.) However, he stated he had a new girlfriend and was attending church, and he was ready to get out of the slump he was in. (R. at 660.) A drug screen was positive for buprenorphine and benzodiazepines. (R. at 660.) Adams was diagnosed with opioid/benzodiazepine dependence, and he received Suboxone treatment. (R. at 659.) On July 10, 2015, Adams reported that he continued to do well, with no cravings or relapses, and he stated that his medications were working well. (R. at 661, 663.) He was attending meetings and church with his new girlfriend, which was keeping him on track. (R. at 661, 663.) He also was employed with a lawn care service. (R. at 661.) His urine drug screen was clear. (R. at 661.) Adams was alert, oriented and cooperative with a normal gait and full strength in all extremities. (R. at 661.) He received Suboxone treatment and was continued on Klonopin. (R. at 661.) Adams was diagnosed with opioid use disorder and anxiety disorder. (R. at 661.)  On July 17, 2015, Adams continued to do well, with no cravings or relapses and continued attending meetings and church services. (R. at 664.) He also continued to work and had a clear urine drug screen. (R. at 664.) Adams stated that he was stable with medications, noting that he was eating and sleeping well and having very few cravings. (R. at 665.) Adams reported that he had been diagnosed with hepatitis C. (R. at 664.) Physical examination was unchanged, but it was noted that Adams was nervous and agitated. (R. at 664.) He was diagnosed with opioid use disorder and anxiety disorder. (R. at 664.)

On October 23, 2015, Adams saw Tauna Gulley, F.N.P., a family nurse practitioner at The Health Wagon, for complaints of diabetes and hepatitis C. (R. at 489-90.) Adams stated he had been diagnosed with hepatitis C and had stopped going to the Suboxone clinic because he could not afford it. (R. at 489.) On

examination, Adams was alert, oriented, pleasant and in no distress, with a normal gait and good eye contact. (R. at 489.) He reported low back pain that radiated into the left leg with occasional numbness, leg cramps, muscle aches, painful joints and sciatica, balance difficulty, fainting and some seizures. (R. at 490.) He reported anxiety and depressed mood, but he denied suicidal thoughts. (R. at 490.) Gulley ordered a hepatitis panel. (R. at 490.) When Adams returned to Gulley on December 11, 2015, he was advised that he was positive for hepatitis C, for which he was initially diagnosed in 2015, but had never received treatment. (R. at 487-88.) Adams stated that he continued to take Suboxone, which he obtained "from friends." (R. at 487.) He stated that he would like to go to UVA in Charlottesville for treatment. (R. at 487.) On examination, he was alert and in no distress, with tenderness to palpation over the lumbosacral spine, paraspinal muscle spasm bilaterally, full range of motion, no swelling or deformity, no edema and full range of motion of the extremities. (R. at 487.) Peripheral pulses were 2+ throughout, and Adams had a normal gait, good eye contact and a flat affect. (R. at 487.) He was diagnosed with acute hepatitis C without hepatic coma, and Gulley referred him to UVA. (R. at 487.)

On January 13, 2016, Adams saw Crystal Burke, L.C.S.W., a licensed clinical social worker at Appalachia Family Health, to establish care for behavioral health needs. (R. at 494-95.) He reported having "bad nerves" and experiencing panic attacks, which he managed by leaving situations. (R. at 494.) He stated that he rarely went into large crowds. (R. at 494.) Adams reported that he had not taken any mental health medications for about a year because he was unemployed and had no health insurance. (R. at 494.) Adams had an appropriate mood and a labile affect, eye contact was appropriate, orientation and thought process were intact, judgment and insight were good, and he had no paranoia/delusions or suicidal/homicidal ideations. (R. at 494.) Adams was diagnosed with other

depressive episodes and uncomplicated opioid dependence, and he was scheduled to begin mental health medication management and counseling. (R. at 494.)

Adams sought treatment at Sunrise Medical Associates, another Suboxone clinic, from March 1, 2016, to April 8, 2016. (R. at 497-503.) On March 1, 2016, Adams reported that he was currently using benzodiazepines and Suboxone off the street and that he had been opiate dependent for 16 years. (R. at 502-03.) He reported a history of bipolar disorder and schizophrenia for which he had taken Celexa, Vistaril and Paxil, but was not currently medicated. (R. at 503.) Adams stated that his treatment goal was to get clean. (R. at 503.) A physical examination was normal. (R. at 502.) Adams was diagnosed with opiate dependence and bipolar disorder, not otherwise specified, and he was prescribed Suboxone. (R. at 502.) It was noted that he would receive treatment for bipolar disorder at Stone Mountain Health. (R. at 502.) On March 8, 2016, Adams reported no relapses, a physical examination was normal, and he was diagnosed with opiate dependence and bipolar disorder. (R. at 501.) Adams was continued on Suboxone, and it was noted that he also was taking Klonopin, Valium, Hydroxyzine and Neurontin. (R. at 501.) Adams continued to treat at Sunrise on a weekly basis through April 8, 2016. (R. at 497-500.) Over this time, he had normal physical examinations, and his diagnosis remained unchanged. (R. at 497-500.) On March 22, 2016, it was noted that Adams had been prescribed Celexa, Latuda and Vistaril for his psychiatric impairments. (R. at 499.) It also was noted that he was doing well with his recovery. (R. at 499.) However, on April 8, 2016, Adams reported that he had suffered a relapse, stating that he had inappropriately taken Klonopin. (R. at 497.) A physical examination was normal. (R. at 497.)

On March 16, 2016, Adams saw both Ava Martin, PMHNP-BC, a board certified psychiatric mental health nurse practitioner, and social worker Burke, at

Appalachia Family Health. (R. at 540-45.) Adams reported that he suffered from panic attacks and had been diagnosed previously with bipolar disorder. (R. at 542.) He also reported that he had done well on Latuda, Celexa and Vistaril in the past. (R. at 542.) He stated that he was placed in special education due to panic attacks. (R. at 542.) Adams stated that he had been addicted to pain pills and Klonopin in the past for four to five years and had overdosed on Klonopin, stating "I wanted to die." (R. at 542.) Adams stated that he had been psychiatrically hospitalized twice. (R. at 542.) He reported that he had a girlfriend for the previous year and that he liked to walk to clear his head. (R. at 542.) Adams reported depression, lack of interest, anxiety, past suicide attempt, panic, moodiness, obsessive thoughts and obsessions, past impulsivity and not sleeping well. (R. at 543.) On physical examination, he was alert, oriented, cooperative and in no acute distress, he had a clean and casual appearance, appropriate eye contact, intact thought process, insight and judgment were fair, intact recent and remote memory, no paranoia or delusions, unremarkable motor movements, regular speech, good articulation, average intellect, no suicidal or homicidal ideations, a euthymic mood and a mildly anxious affect. (R. at 543-44.) Martin diagnosed other depressive episodes; uncomplicated opioid dependence; generalized anxiety disorder; and unspecified insomnia, and she prescribed Celexa, Latuda and Vistaril. (R. at 544.)

On April 15, 2016, Adams returned to Gulley for completion of his "disability papers." (R. at 529-30.) He reported no depression or anxiety since starting the mental health medications. (R. at 529.) He stated that he could not read well, and he estimated that he could stand for about 30 minutes at a time. (R. at 529.) On physical examination, he was alert and in no distress, he had paraspinal muscle spasm bilaterally, he was tender to palpation over the lumbosacral spine, straight leg raising test was positive bilaterally, he had full range of motion without swelling or deformity, peripheral pulses were 2+ throughout, Adams was

cooperative, he had good eye contact, and speech was clear. (R. at 529.)  Gulley diagnosed acute hepatitis C without hepatic coma, and she encouraged Adams to keep his appointment with UVA. (R. at 530.)

On April 20, 2016, Gulley completed a mental assessment of Adams, finding that he was mildly[10] limited in his ability to maintain personal appearance, moderately[11] limited in his ability to understand, remember and carry out simple, detailed and complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations and markedly[12] limited in his ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration and to demonstrate reliability. (R. at 532-34.) She found that Adams could not manage benefits in his own best interest and would be absent from work more than two days monthly due to his impairments. (R. at 534.) She based her findings on Adams's diagnoses of bipolar disorder treated with multiple medications, problems with memory and comprehension, difficulty reading, limited education, missing several appointments, problems with reliability, not having a driver's license, having chronic musculoskeletal problems secondary to being hit by a car and having hepatitis C. (R. at 532-34.)

Also on April 20, 2016, Gulley completed a physical assessment of Adams, finding that he could lift/carry items weighing up to seven pounds occasionally and

---

[10] A mild limitation is defined on the form as a "slight" limitation which leaves an individual with the ability to generally function well. (R. at 532.)

[11] A moderate limitation is defined on the form as "more than slight," but the individual retains the ability to function satisfactorily. (R. at 532.)

[12] A marked limitation is defined on the form as a "serious" limitation, resulting in unsatisfactory work performance. (R. at 532.)

up to five pounds frequently. (R. at 536-38.) She found he could stand/walk for a total of two hours in an eight-hour workday, but for 30 minutes without interruption, and that he could sit for a total of one hour in an eight-hour workday, but for up to 30 minutes without interruption. (R. at 536-37.) Gulley found that Adams could occasionally climb, stoop, kneel, balance, crouch and crawl, and that his ability to work around heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity and vibration were affected by his impairments. (R. at 537-38.) She found that Adams would be absent from work more than two days monthly. (R. at 538.) Gulley based these findings on degenerative changes in Adams's low back, pain in the right buttock and hip, chronic back and hip pain, emphysema, COPD, chronic pain, hepatitis C, bipolar disorder and Suboxone use. (R. at 536-38.)

On November 15, 2016, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Adams at the request of Adams's counsel. (R. at 10-18.) Lanthorn noted that Adams underwent testing by a school psychologist at the age of 15, which indicated a need for special education services. (R. at 12.) Adams reported experiencing three to four panic attacks monthly, each lasting up to three minutes. (R. at 13.) He reported that he had struggled with depression since he was a teenager and was prescribed Xanax for anxiety in the seventh grade. (R. at 13.) Adams stated that he preferred to be alone and enjoyed very little in life. (R. at 13.) He reported that his concentration ranged from erratic to poor, and his energy level was low. (R. at 13.) After 10 minutes, Adams could recall only two of five words, he could not perform Serial 7's or Serial 3's, he could interpret only one commonly used adage out of three, and he could not spell the word "world" either forwards or backwards. (R. at 14.) His thinking was notably concrete, and questions that were abstract or complicated in any major way were beyond his capabilities. (R. at 14.) Adams's hands were quite

tremulous. (R. at 14.) Lanthorn noted that Adams gave a good faith effort on IQ testing, the results of which were deemed to be a valid and accurate reflection of his current intellectual functioning. (R. at 14.)

WAIS-IV testing yielded a full-scale IQ score of 63, placing Adams in the extremely low range of intellectual functioning. (R. at 14.) He obtained a verbal comprehension index score of 68, a perceptual reasoning index score of 63, a working memory index score of 63 and a processing speed index score of 81. (R. at 14-15.) The Minnesota Multiphasic Personality Index – Second Edition, ("MMPI-2"), resulted in a profile that must be interpreted with caution due to Adams's pattern of responses. (R. at 15.) These test results indicated moderate to severe emotional distress, including depression, agitation, anxiety, guilt and dysphoria. (R. at 16.) They also indicated difficulties with concentration and memory and that Adams was severely depressed. (R. at 16.) Adams's scores on the anxiety scale were quite high and indicated he was easily agitated. (R. at 16.) Lanthorn diagnosed Adams with major depressive disorder, recurrent, moderate, with moderate anxious distress. (R. at 16.) He found that he was competent to manage his own funds. (R. at 16.) Lanthorn strongly encouraged Adams to continue psychiatric or psychotherapeutic intervention. (R. at 16.) He noted that Adams was likely to have some mild limitations in understanding and remembering location and work-like procedures, and his capacity to do this would depend on the complexity of the task facing him. (R. at 16-17.) Adams would have mild or greater limitations in the ability to concentrate or persist at tasks and in adapting to changes and requirements in the work setting. (R. at 17.) Lanthorn found that Adams would have mild limitations on his ability to interact with others. (R. at 17.)

On November 29, 2016, Lanthorn completed a mental assessment of Adams, finding that he was moderately to markedly limited in his ability to follow work

rules, moderately limited in his ability to relate to co-workers, to function independently, to maintain attention and concentration, to understand, remember and carry out simple job instructions and to maintain personal appearance, markedly limited in his ability to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability and extremely[13] limited in his ability to understand, remember and carry out complex job instructions. (R. at 19-21.) Lanthorn found that Adams could manage benefits in his own best interest, and he opined that he would be absent from work more than two days monthly. (R. at 21.) In support of these findings, Lanthorn noted only "Please see report." (R. at 20-21.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2018).

---

[13] An extreme limitation is defined on the form as a "major" limitation, resulting in no useful ability to function. (R. at 19.)

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011, West 2012 & 2018 Supp.); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§

404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Adams argues that the ALJ erred by failing to fully develop the record regarding his mental impairment. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5). He also argues that the ALJ improperly determined his residual functional capacity. (Plaintiff's Brief at 5-7.) For the reasons that follow, I find that substantial evidence supports the ALJ's decision.

First, Adams argues that the ALJ should have fully developed the record by obtaining additional testing to clarify the extent of his learning disorder. (Plaintiff's Brief at 4-5.) I am not persuaded by this argument. The ALJ does have a duty to help develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Specifically, "… the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Cook*, 783 F.2d at 1173 (citations omitted). However, the regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1513(e), 416.913(e) (2016).[14] Moreover, "the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Zook v. Comm'r of Soc. Sec.*, 2010 WL 1039456, at *4 (E.D. Va. Feb. 25, 2010) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)). More specifically, while the ALJ bears some responsibility for development of the record, the ALJ "has the right to assume that counsel is presenting the claimant's strongest case for

---

[14] This was the regulation that was in effect at the time the ALJ rendered his decision.

benefits." *Epperly v. Colvin*, 2015 WL 5138373, at *5 (W.D. Va. Aug. 31, 2015) (quoting *Blankenship v. Astrue*, 2012 WL 259952, at *13 (S.D. W. Va. Jan. 27, 2012)). The Fourth Circuit has held that, in order for a case to be remanded for failure to develop the record, two requirements must be met: (1) the ALJ failed to fully inquire into the issues necessary for adequate development of the record; and (2) such a failure is prejudicial to the claimant. *See Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). Thus, courts must determine "whether the record is adequate to support a judicious administrative decision[,]" which centers on whether there are "evidentiary gaps" that prejudice the rights of the claimant. *Epperly*, 2015 WL 5138373, at *5 (quoting *Blankenship*, 2012 WL 259952, at *13 (citing *Marsh*, 632 F.2d at 300)).

Here, I find that the ALJ did not fail to fully inquire into the issues necessary for adequate development of the record as it pertains to Adams's alleged learning disorder and related functional impairments. In his decision, the ALJ found that there is no medically determinable intellectual disability based on Adams's school records or the medical evidence of record. (R. at 28.) The ALJ correctly noted that Adams was classified as a "slow learner" by school psychologist Collins when Adams was 15 years old based on an IQ score of 81. However, there is no formal diagnosis of any intellectual disability contained in the record. (R. at 28.) The ALJ also noted Collins's assessment that Adams did not give his best effort on testing and that he was anxious for the testing process to be completed. (R. at 30.) Additionally, in an October 7, 2013, Function Report, Adams indicated an ability to count change, handle a savings account and use a checkbook or money orders. (R. at 32.) The only reason he stated that he could not pay bills was because he did not have a job, not that he did not have the cognitive ability to do so. (R. at 32.) Adams further reported that he could pay attention for 45 minutes. (R. at 32.) Although he reported that he had difficulty following written instructions, he stated

that he was good with spoken instructions. (R. at 32.) The ALJ also considered that Adams had a tenth-grade education with special education services, he did not receive his GED, and he was retained in Kindergarten and the second grade. (R. at 31, 33.) The ALJ considered that Adams had difficulty reading and understanding and his self report that his memory was "not very good." (R. at 33.) The ALJ also reviewed Adams's school performance, including, among other things, passing all literacy passport testing requirements prior to the eighth grade, receiving WRAT-3 scores that were well below grade level, but within expectancy levels, in reading, math and spelling and failing the standards of learning, ("SOL"), test in Earth Science in ninth grade. Nonetheless, the ALJ also noted that Adams showed no inherent attention deficits and had no difficulty reading or comprehending the items on the various emotional inventories used in the assessment battery, that it was his poor "socioemotional adjustment" that precipitated Collins's recommendation for special education classes, that Adams was identified as a candidate for a standard high school diploma, that a grade decline in eighth grade coincided with a drop in school attendance[15] at the time of a psychiatric referral and treatment for suicidal ideation, various emotional complaints and alopecia and that he passed the Biology SOL in tenth grade. (R. at 34-35.) The ALJ explained that the residual functional capacity finding encompassed all of Adams's documented signs and symptoms, regardless of the diagnostic label used at any given time, and their limiting effects. (R. at 28.)

It is clear from the ALJ's decision that he thoroughly reviewed the evidence before him as it related to the time period relevant to the determination of Adams's claims and any allegation of a learning disorder. I find that there are no "evidentiary gaps" in the record. Instead, I find that there simply is a lack of

---

[15] Adams was absent 76 days during eighth grade, 37 days during ninth grade and 87 days during tenth grade. (R. at 455.)

evidence to support any allegations of the existence of a learning disorder resulting in disabling work-related limitations. In addition to the evidence cited above, the record shows that, during the relevant time period, Adams's mental status examinations were largely unremarkable, including full orientation, good eye contact, clear, coherent and relevant speech, no abnormal psychomotor activity, average general fund of knowledge, grossly intact cognitive functioning, intact thought associations, organized and goal-directed thinking and no more than mildly depressed mood and mildly anxious affect. Adams's mental impairments were treated conservatively with medications and counseling. There is no evidence of any psychiatric hospitalizations in the record. Moreover, Adams reported that medications helped his mental health conditions, particularly when he was not abusing substances. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").

Subsequent to the relevant time period, and after the ALJ issued his decision, a consultative evaluation performed by psychologist Lanthorn showed that Adams was functioning in the extremely low range of intelligence. However, Lanthorn concluded that Adams was likely to have only mild limitations in the areas of understanding and remembering locations and work-like procedures, as well as interacting with others. He found that Adams would have at least mild limitations in the area of concentrating or persisting at tasks and in adapting to changes and requirements in the work setting. Lanthorn did not diagnose Adams with any learning disorder or cognitive dysfunction. Instead, he diagnosed Adams with major depressive disorder, recurrent, moderate, with moderate anxious distress. Both depression and anxiety were diagnoses contained in the record that was before the ALJ. While Lanthorn's mental assessment indicates that Adams was suffering from moderate, marked and even extreme limitations, for the reasons

discussed below, this opinion is not entitled to much weight. Lastly, the court notes that Adams did not allege a learning disorder as a basis for his disability.

Thus, I find that the ALJ did not fail to fully develop the record with regard to Adams's alleged learning disorder. There are no evidentiary gaps contained in the record, prejudicial to Adams's rights, and which prevent a judicious administrative decision as to his disability claim.

To the extent that Adams is arguing that the ALJ should have ordered a consultative examination, I also am not persuaded. Title 20 C.F.R. §§ 404.1512(b)(2), 416.912(b)(2) provides that a consultative examination is required when the necessary information is not readily available from the records of the claimant's medical treatment source, or the Commissioner is unable to seek clarification from the claimant's medical source. A consultative examination also is required when the record evidence, as a whole, is insufficient to support a decision or when "[t]here is an indication of a change in [the claimant's] condition that is likely to affect [the claimant's] ability to work …, but the current severity of [the claimant's] impairment is not established." 20 C.F.R. §§ 404.1519a(b)(4), 416.919a(b)(4) (2018). Importantly, "the decision to order a consultative examination is committed to the discretion of the ALJ, and where the record as a whole provides sufficient, unambiguous, and non-conflicting evidence to support the ALJ's decision, a consultative examination is not required." *Keplinger v. Astrue*, 2008 WL 4790663, at *5 (W.D. Va. Nov. 3, 2008). For all of the reasons stated above, I find that the record was complete enough for the ALJ to make an informed decision that Adams did not suffer from a disabling learning disorder during the relevant time period. I also find that there is no indication in the record of a change in Adams's condition that is likely to affect his ability to work. I find further that the evidence of record pertinent to this issue largely is consistent and,

thus, the ALJ did not have any conflicts to resolve that would be served by a consultative examination. Lastly, I note that, while the ALJ did not order a consultative examination at Government expense, Adams's counsel did obtain one. Although this consultative examination was not completed before the ALJ rendered his decision, Adams's counsel sent it to the Appeals Council, and this court has had the benefit of reviewing it.

For all of the above-stated reasons, I find that the ALJ's decision was based on an adequately developed record, and the ALJ was within his discretion in not ordering a consultative examination.

Adams also argues that the ALJ improperly determined his residual functional capacity. (Plaintiff's Brief at 5-7.) In particular, Adams argues that the ALJ erred by rejecting the opinions of his treating healthcare provider, nurse practitioner Gulley, instead, giving significant weight to the opinions of the state agency medical consultants. For the reasons that follow, I find that substantial evidence supports the ALJ's weighing of the medical evidence and his residual functional capacity finding. At the hearing level, the responsibility for determining a claimant's residual functional capacity rests solely with the ALJ. *See* 20 C.F.R. §§ 404.1546, 416.946 (2018). The regulations allow no special significance for the source of an opinion on this issue. *See* 20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3) (2018). The Fourth Circuit has held that the Commissioner is not bound even by a treating physician's opinion if it is not supported by clinical evidence or if it is inconsistent with the other substantial evidence of record. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

In this case, the ALJ found that Adams had the residual functional capacity to perform a limited range of medium work that did not require more than

occasional interaction with the public or co-workers, no more than occasional use of judgment on the job and that could be performed by someone who would be off task for about 10 percent of each workday and would be absent from work about once monthly. (R. at 31.)

I first will address Adams's argument as it pertains to his mental impairments. After carefully considering the evidence, the ALJ concluded that Adams suffered no more than moderate functional difficulties as a result of his mental impairments, resulting in the limitations reflected in the residual functional capacity. (R. at 42.) The ALJ gave significant weight to the state agency psychological consultants' opinions that Adams could perform simple and repetitive tasks, but may have some difficulty interacting with the public, as such opinions were well-supported and consistent with the totality of the evidence. (R. at 43.) The ALJ gave "less weight" to Gulley's April 20, 2016, mental assessment, in which she found marked difficulties in the area of making occupational adjustments, moderate difficulties in understanding, remembering and carrying out even simple job instructions and moderate difficulties in behaving in an emotionally stable manner and relating predictably in social situations. (R. at 44.) Gulley also opined that Adams would miss more than two days of work monthly due to his combined impairments. (R. at 44.) In weighing the evidence of record and arriving at the residual functional capacity determination, the ALJ noted Adams's positive response to treatment when he was compliant therewith; the benign clinical findings reflected in the treatment notes of substance abuse counselor Palmer, nurse practitioner Thompson/Dr. Bass, mental health nurse practitioner Martin and social worker Burke; GAF scores assessed by various treatment providers, indicating only moderate symptoms; and Adams's improved functioning.

Moreover, I find that the ALJ fully considered Gulley's check-box form opinion, indicating that Adams had moderate to marked limitations. As noted by the Commissioner, Gulley, a nurse practitioner, is not an acceptable medical source under the regulations. Thus, her opinion could not be entitled to controlling weight. *See* S.S.R. 06-03p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2013 Supp.). Moreover, she saw Adams a handful of times with regard to his hepatitis C, not his mental health complaints. The ALJ explained that Gulley also appeared to rely heavily on the fact that Adams was in mental health treatment and had a limited education. However, the ALJ found that such considerations are not strong evidence of the existence of marked difficulties in the areas identified by Gulley. *See Gross*, 785 F.2d at 1166 ("[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss."). As stated above, Adams showed a positive response to treatment and his mental status was consistently grossly intact. Also, on April 15, 2016, just five days before Gulley's mental assessment of Adams, he reported no depression or anxiety since starting mental health medications, he was cooperative with good eye contact, and he had clear speech.

Additionally, the ALJ considered the GAF scores of 55 assessed during the relevant time period by Palmer and Thompson/Dr. Bass. Such a score indicates only moderate symptoms. The ALJ gave these scores some weight because they were generally consistent with Adams's symptoms and clinical presentation over time. For instance, in December 2013, Adams was assessed a GAF score of 55. At that time, he reported having a nice Christmas and enjoying time with his family. He reported no drug use and stated that, although he had some mood swings, Celexa and drug cessation were helping with anxiety. On examination, he was alert, oriented, appropriately groomed, pleasant and cooperative. He was only mildly anxious with a good range of affect. He interacted appropriately and had

good eye contact. He reported no suicidal or homicidal ideations, and there was no evidence of psychosis.

Adams argues that the opinions of the state agency psychologists are stale, as they are not based on a review of all of the evidence. The Commissioner acknowledges that the record was stale at the time Dougherty and McClain reviewed it, but this will always be the case since state agency review precedes ALJ review. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Rives v. Astrue*, 2010 WL 2944591, at *4 n.7 (E.D. Va. Apr. 12, 2010). Nonetheless, it is apparent from the ALJ's very thorough decision that he carefully evaluated the whole record before him when weighing the opinion evidence, and he ultimately found the state agency psychologists' opinions consistent with the record as a whole.

Adams argues that Gulley's opinion is supported by that of psychologist Lanthorn. As previously stated, the ALJ did not have Lanthorn's evaluation and assessment before him, but this court must consider it. I do not find that Lanthorn's assessment necessarily supports Gulley's opinion. Gulley found that Adams had an unsatisfactory ability in the areas of following work rules, relating to co-workers, dealing with the public, using judgment, interacting with supervisors, dealing with work stresses, functioning independently, maintaining attention and concentration and demonstrating reliability. Lanthorn also found that Adams had an unsatisfactory ability in the vast majority of these areas on the check-box assessment form. However, in the narrative included in his evaluation report, Lanthorn stated that Adams had only mild limitations in the areas of understanding or remembering locations and work-like procedures and in his ability to interact with others. Thus, his assessment and evaluation are inconsistent and not entitled to great weight.

It is for all of the above-stated reasons that I find that the ALJ's weighing of the evidence and resulting mental residual functional capacity finding are supported by substantial evidence in the record. Next, I will turn to the ALJ's weighing of the evidence and residual functional capacity finding with regard to Adams's physical impairments.

The only argument that Adams appears to make in this regard is that the ALJ should have given more weight to the opinion evidence from Gulley instead of the state agency physicians. In a physical assessment dated April 20, 2016, Gulley opined that Adams could perform less than the full range of sedentary work. More specifically, she found that Adams could lift/carry items weighing up to only seven pounds occasionally and up to five pounds frequently; that he could stand and/or walk for a total of only two hours in an eight-hour workday, but for 30 minutes without interruption; that he could sit for a total of one hour in an eight-hour workday, but for only 30 minutes without interruption; that he could occasionally climb, stoop, kneel, crouch and crawl; and that his ability to work around heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity and vibration were affected by his impairments. Gulley found that Adams would be absent from work more than two days monthly. She based these findings on degenerative changes in Adams's low back, pain in the right buttock and hip, chronic back and hip pain, emphysema, COPD, chronic pain, hepatitis C, bipolar disorder and Suboxone use.

State agency physician, Dr. McGuffin, found Adams could perform work at all exertional levels with no climbing of ladders, ropes or scaffolds, frequent climbing of ramps and stairs and no concentrated exposure to hazards. State agency physician, Dr. Bacani-Longa, found that Adams could perform medium work; that he could stand/walk about six hours in an eight-hour workday; sit for

about six hours in an eight-hour workday; that he could frequently climb ramps and stairs, stoop, kneel and crouch; occasionally crawl; and never climb ladders, ropes or scaffolds; and that he should avoid even moderate exposure to hazards, such as machinery and heights.

The ALJ gave significant weight to the opinions of the state agency physicians because they were well-supported and consistent with the totality of the evidence. He gave less weight to the opinion of Gulley because it was contrary to the fairly benign findings contained in the record, including findings documented by Gulley herself. (R. at 43.) For instance, when Adams saw Gulley in October 2015, he was in no distress, and he had a normal gait. In December 2015, he exhibited some tenderness to palpation over the lumbosacral spine and had paraspinal muscle spasm bilaterally, but Adams was in no distress, he had full range of motion of the back and of the extremities, there was no swelling or deformity of the back, no edema of the extremities, and he had a normal gait. In April 2016, despite bilateral paraspinal muscle spasm, tenderness to palpation of the lumbosacral spine and bilateral positive straight leg raise testing, Adams was in no distress, and he had a full range of motion without swelling or deformity. Treatment notes from Gulley do not contain any restrictions on Adams's activities, nor does it appear that she prescribed any medications. Additionally, diagnostic imaging contained in the record reveals only mild to moderate degenerative changes in Adams's thoracolumbar spine, and he consistently had no neurological deficits. Adams's gait also was consistently normal, and he advised Martin in March 2016 that he liked to walk to clear his head. Moreover, on more than one occasion in July 2015, he reported that he was working in the lawn care industry. Adams was treated conservatively for his low back pain and seizure disorder, and he received no treatment for his hepatitis C, as none was recommended.

For these reasons, I find that substantial evidence supports the ALJ's weighing of the evidence and residual functional capacity finding as it pertains to Adams's physical impairments.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The ALJ fully developed the record regarding Adams's alleged learning disorder;

2. The ALJ did not abuse his discretion by not ordering a consultative examination related to Adams's learning disorder;

3. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

4. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

5. Substantial evidence exists in the record to support the Commissioner's finding that Adams was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Adams's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    April 29, 2019.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE